FILED IN MY OFFICE
DISTRICT COURT CLERK
3/3/2015 9:01:57 PM
STEPHEN T. PACHECO
Joan Chernock

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT


LYDIA LEYBA and
LAWRENCE TRUJILLO as the
Co-Personal Representatives of the
ESTATE OF ROBERT "BOBBY"
DOMINGUEZ, deceased,

    Plaintiffs,

v.                                                     No. D-101-CV-2015-00572

CITY OF SANTA FE;
CHARLES A. LARAMIE, II;
RAYMOND J. RAEL; BOARD OF
COUNTY COMMISSIONERS OF
SANTA FE COUNTY; SANTA FE
REGIONAL EMERGENCY
COMMUNICATIONS CENTER
BOARD OF DIRECTORS;
ROBERT EAGAN; JUDITH EAGAN;
and DOES I-V.

    Defendants.

## COMPLAINT FOR WRONGFUL DEATH UNDER THE NEW MEXICO TORT CLAIMS ACT AND NEW MEXICO COMMON LAW AND PETITION FOR APPOINTMENT OF CO-PERSONAL REPRESENTATIVES

Plaintiffs Lydia Leyba and Lawrence Trujillo, by and through their attorneys, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu LLP, seek appointment as Co-Personal Representatives of the Estate of Robert "Bobby" Dominguez, and bring this complaint for damages against Defendants pursuant to the New Mexico Wrongful Death Act, NMSA 1978, § 41-2-1 to -4, the New Mexico Tort Claims Act, NMSA 1978, § 41-4-1 to -30, and New Mexico common law.

**EXHIBIT 1**

**PARTIES**

1.      Plaintiffs Lydia Leyba and Lawrence Trujillo are the children of Robert "Bobby" Dominguez, deceased, and seek appointment as Co-Personal Representatives of the Estate of Robert "Bobby" Dominguez, deceased.

2.      At the time of his death, Robert "Bobby" Dominguez was 78 years old and a resident of Santa Fe County, New Mexico.

3.      Defendant City of Santa Fe (the "City") is an incorporated municipality, a body politic, and a municipal corporation under the laws of the State of New Mexico. It also is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(B)-(C). As such, it may sue or be sued in its name. It has the authority to employ police officers, and to delegate to the Santa Fe Police Department ("SFPD") and the SFPD Chief, final policy and decision-making authority over law enforcement matters. SFPD is a division or a department of the City, which the City controls and operates. The City is responsible for the actions of its employees and agents.

4.      Defendant Charles A. Laramie, II is a SFPD law enforcement officer. At all times material hereto, Laramie has been a resident of Santa Fe County, New Mexico and was employed by SFPD and the City. At all times material hereto, Laramie was a law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D), (F)(2), and was acting in the course and scope of his duties and employment.

5.      At all times material hereto Defendant Raymond J. Rael was the Chief of Police of SFPD. At all times material hereto, Rael has been a resident of Santa Fe County, New Mexico and has been employed by SFPD and the City. At all times material hereto, Rael was a

law enforcement officer and public employee as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(D), (F)(2), and was acting in the course and scope of his duties and employment.

6. Defendant Board of County Commissioners of Santa Fe County (the "County") is a political subdivision of the State of New Mexico. Pursuant to NMSA 1978, § 4-46-1, all suits or proceedings against a county are to be brought in the name of the board of county commissioners of that county. The County is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(B) and (C). The County is responsible for the actions of its employees and agents.

7. Defendant Santa Fe Regional Emergency Communications Center Board of Directors ("RECC Board") is responsible for the operation of the Santa Fe Regional Emergency Communications Center ("RECC"). The RECC has existed since 2002 as the result of a Joint Powers Agreement between the City and the County. The RECC receives all emergency and non-emergency calls for the City and the County and dispatches the appropriate agency to the location as needed. The RECC Board is a governmental entity and local public body as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, § 41-4-3(B) and (C). The RECC Board is responsible for the actions of its employees and agents.

8. Defendants Does I-V ("RECC Operators"), upon information and belief, are now and all times material hereto have been residents of Santa Fe County, New Mexico. At all times material hereto, RECC Operators were employed by RECC as 911 or emergency communications operators or dispatchers. At all times material hereto, RECC Operators were law enforcement officers or public employees as those terms are defined in the New Mexico Tort Claims Act, NMSA 1978, §§ 41-4-3(D) and (F)(2) and/or (3). At all times material hereto,

RECC Operators were acting within the scope of their duties and employment with RECC.

9. Defendant Robert Eagan is a resident of Blaine, Washington. With his wife, he owns the house at 512 Johnson Lane, Santa Fe, New Mexico, where Mr. Dominguez was shot.

10. Defendant Judith Eagan is a resident of Blaine, Washington. With her husband, she owns the house at 512 Johnson Lane, Santa Fe, New Mexico, where Mr. Dominguez was shot.

## JURISDICTION AND VENUE

11. All of the material acts and omissions complained of herein occurred in Santa Fe County, New Mexico.

12. The Court has original jurisdiction over Plaintiffs' claims brought under the New Mexico Tort Claims Act pursuant to NMSA 1978, § 41-4-18(A).

13. The Court has original jurisdiction over Plaintiffs' non-Tort Claims Act claims pursuant to N.M. Const. art. VI, § 13.

14. Venue for Plaintiffs' Tort Claims Act claims is proper in this district pursuant NMSA 1978, § 41-4-18(B).

15. Venue for Plaintiffs' Non-Tort Claims Act claims is proper in this district pursuant to NMSA 1978, § 38-3-1(A), (B).

16. All of the acts complained of herein which constitute the basis for liability on the claims brought pursuant to the New Mexico Tort Claims Act come within the scope of the waivers of immunity contained within the act.

17. Plaintiffs have given written notice of the claims contained herein pursuant to the New Mexico Tort Claims Act in compliance with the requirements of the act, NMSA 1978 § 41-4-16.

## PETITION FOR APPOINTMENT OF CO-PERSONAL REPRESENTATIVES

18. The preceding paragraphs are incorporated as if fully stated herein.

19. Lydia Leyba and Lawrence Trujillo hereby move the Court, pursuant to the New Mexico Wrongful Death Act, NMSA 1978 § 41-2-3, and Rule 1-017(B) NMRA, for an order appointing them as Co-Personal Representatives under the Wrongful Death Act, and authorizing them to represent the Estate of Robert "Bobby" Dominguez, deceased, in connection with the claims presented in this complaint. *See, e.g., Chavez v. Regents of Univ. of N.M.*, 1985-NMSC-114, ¶ 20, 103 N.M. 606, 711 P.2d 883 (wrongful death personal representatives need not be appointed prior to the filing of a wrongful death suit); Rule 1-017(B).

20. Ms. Leyba and Mr. Trujillo are the children of Mr. Dominguez.

21. Mr. Dominguez had no spouse at the time of his death.

22. Ms. Leyba and Mr. Trujillo are appropriate persons to serve as Co-Personal Representatives for purposes of presenting the Wrongful Death Act claims herein. *See* NMSA 1978 § 41-2-3.

23. Plaintiffs will seek the concurrence of opposing counsel in this motion, once opposing counsel has entered his or her appearance in this matter.

24. WHEREFORE, for the foregoing reasons, Ms. Leyba and Mr. Trujillo respectfully request that the Court enter an order appointing them to serve as Co-Personal Representatives for the purpose of presenting the claims of the Estate of Robert "Bobby" Dominguez in the present proceedings.

## FACTS RELEVANT TO ALL CAUSES OF ACTION

25. The preceding paragraphs are incorporated as if fully stated herein.

26. Mr. Dominguez was a Navy veteran who fought in the Korean War. He was a

5

former Santa Fe police officer and county sheriff's deputy.

27. Mr. Dominguez lived in Santa Fe, New Mexico for his entire life and in a home on Johnson Street for many years.

28. Mr. Dominguez was a well-known and active member of the neighborhood. His neighbors sometimes referred to him as the unofficial "mayor" of the neighborhood. He acted as a caretaker for several homeowners on Johnson Street.

29. The Eagans live out of state but own a home at 512 Johnson Lane, a few houses away from Mr. Dominguez's house.

30. For approximately ten years, Mr. Dominguez acted as the caretaker of the Eagans' home when they were out of state. The Eagans paid him to take care of their home while they were away, which generally was approximately nine months of the year. Mr. Dominguez had a key to the Eagans' house and was permitted to enter it when they were away.

31. At approximately 3:36 a.m. on Monday, March 4, 2013, Mr. Dominguez was shot multiple times by SFPD Officer Laramie at the Eagans' residence.

32. The Eagans' house was protected by an alarm system. Mr. Dominguez had the alarm code.

33. Mr. Dominguez was the "Notification-Only Contact" for the Eagans with the alarm company. As a Notification-Only Contact, he was to be called in response to an alarm only after emergency services were notified or in the case of a non-emergency.

34. The Eagans' had asked Mr. Dominguez to be the contact person for the alarm company and instructed him to check on the house if the alarm company ever called him. They did not inform Mr. Dominguez that police officers also would be notified of a sounding alarm and dispatched to the home. Their actions set up the disaster that occurred.

35. Early in the morning of March 4, 2013, Mr. Dominguez was awakened by calls from the Eagans' alarm company notifying him that the alarm was going off at the Eagans' home.

36. Meanwhile, at or about 3:19 a.m., Laramie and other SFPD officers were dispatched by RECC and RECC Operators to the Eagans' home based on calls from the alarm company.

37. Despite the obvious potential danger of this situation, RECC Operators failed to warn Laramie and other SFPD officers responding to the alarm that the alarm company had also notified a neighbor of the alarm.

38. Mr. Dominguez got up, got dressed, and walked down the street from his own house to the Eagans' house to check on it as the Eagans had instructed him do. He took his gun with him as a precaution.

39. Mr. Dominguez arrived first and entered the Eagans' home. He turned on some lights and put down his gloves and gun. He was in the kitchen trying to disable the alarm when Laramie arrived.

40. Laramie arrived at the Eagans' at approximately 3:31 a.m. He was alone.

41. Instead of waiting for backup to arrive, Laramie approached the home through the open gate to the courtyard. As he entered the courtyard, he had his weapon drawn. In proceeding in this manner, Laramie precipitated what followed.

42. From the courtyard, he could see that the front door to the home was open. He could hear someone moving around inside.

43. Laramie could see that there was a light on inside the home and could hear movement inside. He heard the alarm turn off for a few moments and then turn back on, which

7

indicated that the person inside had the alarm code and was attempting to disable it.

44. From the courtyard, Laramie could see inside the lighted doorway. He saw Mr. Dominguez inside the house through the door.

45. Laramie pointed his flash light at Mr. Dominguez and identified himself as SFPD. Laramie asked Mr. Dominguez for his name.

46. Mr. Dominguez responded by saying "Robert Dominguez."

47. Shortly thereafter, Laramie fired his weapon at Mr. Dominguez five times in quick succession from the courtyard.

48. Mr. Dominguez was hit and fell to the ground.

49. Laramie then fired two more rounds at Mr. Dominguez as he was lying wounded on the ground.

50. Laramie's shots hit Mr. Dominguez three times, resulting in three gunshot wounds: one entry in the middle of his torso below his chest, one through the abdomen, and one through the arm. The shots nicked internal organs including his liver and kidneys, and produced significant internal bleeding.

51. After shooting him repeatedly, Laramie entered the home and slowly approached Mr. Dominguez. Mr. Dominguez gave Laramie a yellow piece of paper and told him it was the alarm code. Laramie used the code to deactivate the alarm.

52. After shooting Mr. Dominguez, at or about 3:37 a.m., Laramie reported shots fired over his radio. In reporting the shooting, he falsely claimed for the first time that Mr. Dominguez had drawn a gun on him. Laramie also falsely claimed in the post-shooting investigation that Mr. Dominguez has pointed a gun at him.

53. After the shooting, Mr. Dominguez adamantly denied that he ever drew his

weapon on Laramie. In fact, he was not even holding the gun at the time that Laramie repeatedly shot him.

54. Additional SFPD personnel arrived at the scene several minutes after the shooting. One of the officers, Officer Chris McCord, began to treat Mr. Dominguez's wounds.

55. Paramedics arrived shortly thereafter and Mr. Dominguez was transported to Christus St. Vincent Regional Medical Center, where he was stabilized. Given his injuries, Mr. Dominguez was given a 30 to 50 percent chance of survival.

56. Mr. Dominguez underwent multiple surgeries at the hospital that morning. He was then transferred to the New Mexico VA Health Care System hospital in Albuquerque where he remained in critical condition for several weeks and underwent additional surgeries.

57. Mr. Dominguez never fully recovered from the injuries that he sustained in the shooting. Prior to the shooting, he had been in very good health. Over the next few months, his health deteriorated rapidly. He suffered greatly and was in and out of the hospital due to complications from the shooting.

58. Mr. Dominguez died on January 3, 2014. His untimely death was precipitated by the shooting, and the shooting set in motion the series of health-related issues ultimately resulting in Mr. Dominguez' death.

**FIRST CAUSE OF ACTION**
**(Claims Under the Tort Claims Act)**

59. The preceding paragraphs are incorporated as if fully stated herein.

60. Laramie, Real, and the RECC Operators, as law enforcement officers, had the duty in any activity actually undertaken by them to exercise, for the safety of others, a level of care that would be ordinarily exercised by a reasonable, prudent, and qualified law enforcement officer in light of the nature of the circumstances at the time.

61. In addition, as Chief of Police, Rael had a duty to properly screen, hire, train, monitor, supervise or discipline subordinate employees, agents, and contractors as part of his duties.

62. In addition, the RECC Operators had duties to properly screen, classify and prioritize incoming 911 emergency assistance phone calls. These duties included the obligation to inform police officers of all pertinent facts related to calls involving dangerous and potentially violent situations.

63. Laramie breached his duties by failing to follow appropriate procedures, by unnecessarily creating a dangerous situation that would not otherwise have existed and thereby precipitating the unnecessary and unreasonable use of force, and by using unreasonable, unnecessary, unjustified, excessive, and deadly force against Mr. Dominguez. By his acts and omissions as set forth above, Laramie caused personal injury, bodily injury, and wrongful death to Mr. Dominguez resulting from assault, battery, false imprisonment, false arrest, libel, slander, defamation of character, or deprivation of rights, privileges, or immunities secured by the constitutions and laws of the United States and the State of New Mexico.

64. Rael breached his duties by failing to properly screen, hire, train, monitor, supervise or discipline subordinate SFPD law enforcement officers, including Laramie. Rael further breached his duties by failing to adopt or enforce appropriate policies, procedures and protocols and by otherwise failing to take appropriate and reasonable supervisory actions to prevent the harm caused to Mr. Dominguez. Rael's conduct caused personal injury, bodily injury, and wrongful death to Mr. Dominguez resulting from assault, battery, false imprisonment, false arrest, libel, slander, defamation of character, or deprivation of rights, privileges, or immunities secured by the constitutions and laws of the United States and the State of New

Mexico.

65. The RECC Operators breached their duties by failing to inform SFPD officers that Mr. Dominguez had been notified of the Eagans' alarm and might go to the house to check on things. The RECC Operators' conduct caused personal injury, bodily injury, and wrongful death to Mr. Dominguez resulting from assault, battery, false imprisonment, false arrest, libel, slander, defamation of character, or deprivation of rights, privileges, or immunities secured by the constitutions and laws of the United States and the State of New Mexico. The RECC Operators' conduct also caused personal injury, bodily injury, and wrongful death to Mr. Dominguez by the negligence of public employees while acting in the scope of their duties in the operation or maintenance of any building, machinery, equipment, or furnishings.

66. The actions and inactions of Laramie, Rael, and the RECC Operators were direct and proximate causes of the injuries and damages to the Estate of Robert "Bobby" Dominguez as set forth below.

67. The City was the governmental entity that had immediate supervisory responsibility over the actions of the employees of SFPD, including Laramie and Rael. The City had a duty to supervise employees and agents of SFPD to ensure that they did not act negligently.

68. The City and the County were the governmental entities that had immediate supervisory responsibility over the actions of the employees of RECC, including the RECC Operators. The City and County each had a duty to supervise employees and agents of RECC to ensure that they did not act negligently.

69. The City and County are jointly and severally liable for all injuries or damages caused by the negligence of any of its employees and agents under the doctrines of respondeat

11

superior and vicarious liability.

## SECOND CAUSE OF ACTION
### (Claims Under New Mexico Common Law)

70.     The preceding paragraphs are incorporated as if fully stated herein.

71.     The Eagans owed a duty of reasonable care to Mr. Dominguez.

72.     As the owners of the premises where the shooting occurred, the Eagans owed Mr. Dominguez a duty of reasonable care to ensure his physical safety and well-being while he was on the premises.

73.     The Eagans breached these duties by instructing Mr. Dominguez to check on their house if the alarm went off and failing to inform Mr. Dominguez that, in addition the alarm company calling him, police officers also would be called and dispatched to the house.

74.     It was unreasonable for the Eagans to allow Mr. Dominguez unmonitored access to their house when the alarm was set off without taking proper steps to protect him.  It also was unreasonable for the Eagans to have instructed Mr. Dominguez to go check on their house in the event of a sounding alarm when they knew or should have known that police officers also would be responding to such alarms.

75.     The Eagans' actions and inactions were a proximate cause of Mr. Dominguez being shot and injured.

76.     The conduct of the Eagans involved recklessness, gross negligence, willfulness, and/or callous indifference to Mr. Dominguez's rights.

77.     Mr. Dominguez suffered personal injury as a result of the shooting for which the Eagans are liable.

## DAMAGES

78. The preceding paragraphs are incorporated as if fully stated herein.

79. As a direct and proximate result of the above-described conduct of Defendants, the Estate of Robert "Bobby" Dominguez, as represented by its Co-Personal Representatives, Lydia Leyba and Lawrence Trujillo, is entitled to recover damages jointly and severally against Defendants as follows:

    A.    Mr. Dominguez endured intense physical pain and suffering, emotional distress, and psychological fear during the course of the incident described above, up until the time of his death. Therefore, the Estate of Robert "Bobby" Dominguez is entitled to recover damages in an amount to be determined at trial of this action.

    B.    The Estate of Robert "Bobby" Dominguez has lost the present worth of the life of its decedent, including his enjoyment of life, especially given the aggravating circumstances and injuries to his health attending the wrongful and unlawful acts that ultimately resulted in his death, as provided for and as amplified under New Mexico law. Such damages include the value of the loss of life itself, as well as economic damages, impairment to lifetime earning capacity and loss of household services. Therefore, the Estate of Robert "Bobby" Dominguez is entitled to recover damages against Defendants in an amount to be determined at the trial of this action.

    C.    The Estate of Robert "Bobby" Dominguez is responsible for the reasonable and necessary expenses for his funeral, burial, and other costs attendant to Mr. Dominguez's death, including the costs of medical treatment. Therefore, the Estate of Robert "Bobby" Dominguez is entitled to recover special damages to

recoup these costs.

D. Because the conduct of the Eagans involved recklessness, gross negligence, willfulness, and/or callous indifference to Mr. Dominguez's rights, the Estate of Robert "Bobby" Dominguez is entitled to recover awards of punitive and exemplary damages against the Eagans.

WHEREFORE, Plaintiffs request the following relief against Defendants:

A. An award of compensatory damages, jointly and severally, as set forth above and any other consequential, incidental, and special damages, under any or all of the causes of action, in an amount to be determined at the trial of this case

B. An award of punitive damages against the Eagans;

C. An award of pre- and post-judgment interest on any amounts recovered herein;

D. Their costs of action herein; and

E. Such other and further relief as the Court may deem appropriate under the circumstances.

## REQUEST FOR JURY TRIAL

Plaintiffs hereby request a trial by six-person jury on all claims above-listed, pursuant to Rule 1-038 NMRA.

Respectfully submitted,

ROTHSTEIN, DONATELLI, HUGHES, DAHLSTOM,
    SCHOENBURG & BIENVENU LLP

*/s/ Carolyn M. "Cammie" Nichols*
Carolyn M. "Cammie" Nichols
500 4th Street, N.W., Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443

and

*/s/ Mark H. Donatelli*
Mark H. Donatelli
John C. Bienvenu
Kristina Martinez
1215 Paseo de Peralta
Post Office Box 8180
Santa Fe, New Mexico 87504-8180
(505) 988-8004

*Attorneys for Plaintiffs*