IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LYDIA LEYBA and LAWRENCE TRUJILLO,
as co-personal representatives of the ESTATE OF
ROBERT DOMINGUEZ, deceased,

      Plaintiffs,

v.                                                                                   1:16-cv-00185 JHR/LF

CITY OF SANTA FE, CHARLES A. LARAMIE, II,
RAYMOND J. RAEL, BOARD OF COUNTY
COMMISSIONERS OF SANTA FE COUNTY,
SANTA FE REGIONAL EMERGENCY
COMMUNICATIONS CENTER BOARD OF
DIRECTORS, ROBERT EGAN, JUDITH EGAN,
LIVEWATCH SECURITY, LLC d/b/a SAFEMART,
and DOES I-V,

      Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on Defendant LiveWatch Security, LLC d/b/a Safemart's (Defendant) Motion for Summary Judgment, filed on November 22, 2018 [Doc. 110]. Having thoroughly reviewed the parties' submissions and the relevant law, the Court finds that Defendant's Motion for Summary Judgment should be granted in part and denied in part.

### I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

This case, and the claims at issue in the instant motion, arise from the fatal shooting of Robert Dominguez in the early morning on March 4, 2013. [Doc 1-3, ¶¶ 53-56, 127-135; Doc. 97]. Robert and Judith Eagan owned a home located at 512 Johnson Lane, Santa Fe, New Mexico, for which a security system had been installed. [Doc. 97, UMF 1; Doc. 115, p. 2, ¶ 1; Doc. 219, UMF

---

[1] On the record currently before the Court, the facts in this section are undisputed except as noted.

20; Doc 229, p. 2]. The Eagans contracted with LiveWatch for security system monitoring services. [Doc. 110, p. 7; Doc. 219, UMF 20; Doc 219, p. 3, ¶ 7; Doc 229, p. 2]. In turn, LiveWatch contracted with Security Monitoring Services, Inc., a Florida corporation, d/b/a CMS Monitoring Services ("CMS"), to provide monitoring services for the Eagans' security system. [Doc. 110, UMF 9; Doc 219, p. 3, ¶ 9].

As part of the Eagan's monitoring agreement with LiveWatch, they were required to provide two contacts who could be reached prior to contacting law enforcement if the security system was activated. [Doc. 219, UMF 23; Doc 229, p. 2]. The Eagans identified Robert Dominguez as one of the contacts for purposes of the LiveWatch monitoring agreement. [Doc. 219, UMF 24; Doc 229, p. 2]. The Eagans paid Robert Dominguez to watch over the home when they were away, and on March 4, 2013 when the events giving rise to this matter took place, Mr. Dominguez had served as caretaker of the residence for approximately ten years. [Doc. 110, UMF 1; Doc 219, p. 2, ¶ 1].

At approximately 3:20 a.m. on March 4, 2013, a CMS operator contacted Mr. Dominguez after receiving an alarm activation at the Eagan residence. [Doc. 97, UMF 2; Doc. 115, p. 2, ¶ 2; Doc. 219, UMF 1; Doc 229, p. 2]. The following exchange occurred between the CMS operator and Mr. Dominguez:

> **Mr. Dominguez**: Hello?
> **Operator**: Hi, this is the monitoring center calling on a recorded line. I am trying to reach Robert.
> **Mr. Dominguez**: Yeah, what do you want?
> **Operator**: We're calling sir, regarding the Eagan residence on Johnson Lane.
> **Mr. Dominguez**: Yeah.
> **Operator**: We just received a master bedroom burglary alarm activation reporting in.
> **Mr. Dominguez**: Ok, I will be up there in a minute.
> **Operator**: Ok, sir do you know if we need to dispatch the police?
> **Mr. Dominguez**: I can't tell you. I've been asleep.

> **Operator**: Ok, sir if you are not sure then we will continue our, our notification list and they're, they're on the list.
> **Mr. Dominguez**: Yeah. I'll, I'll be up there.
> **Operator**: Alright, thank you sir.

[Doc. 219, UMF 2; Doc 229, p. 2].

After this exchange, the operator updated the CMS system to reflect that she had notified a contact person regarding the security system activation at the Eagan residence. [Doc. 219, UMF 4; Doc 229, p. 2]. The operator then notified the city dispatch center. [Doc. 219, UMF 6; Doc 229, p. 2]. When asked whether a responding party had been notified of the activation, the operator stated that they were "still attempting." [Doc. 219, UMF 6; Doc 229, p. 2]. At approximately 3:36 a.m., a second CMS operator called the dispatch center regarding additional security system activations at the Eagan residence. [Doc. 219, UMF 9; Doc 229, p. 2]. The second CMS operator did not advise the dispatch center that a responding party (Mr. Dominguez) had been contacted regarding the first security system activation at the home. [Doc. 219, UMF 11; Doc 229, p. 2].

Officer Charles Laramie of the Santa Fe Police Department was dispatched to the Eagan residence in response to the security system activation. [Doc. 97, UMF 1; Doc. 115, p. 2, ¶ 1]. Officer Laramie was not aware that Mr. Dominguez had been notified of the security system activation and could be present at the Eagan residence. [Doc. 97, UMF 3; Doc 115, p. 2, ¶ 3]. At approximately 3:37 a.m. Officer Laramie arrived at the Eagan residence and observed that the front door to the residence was open and notified the dispatch center. [Doc. 97, UMF 6; Doc 115, p. 3, ¶ 6; Doc. 219, UMF 13; Doc 229, p. 2].

The dispatch center called the monitoring center to determine whether a responding party had been notified regarding the security system activation. [Doc. 219, UMF 13; Doc 229, p. 2]. The dispatcher spoke to a third CMS operator who confirmed that a responding party had been contacted, but stated, "it looks like he didn't give us any information." [Doc. 219, UMF 14; Doc

229, p. 2]. The dispatcher requested that the monitoring center contact the responding party again and ask him to meet the responding officer at the Eagan residence. [Doc. 219, UMF 15; Doc 229, p. 2]. Meanwhile, Officer Laramie could hear someone moving around inside the residence. [Doc. 97, UMF 7; Doc. 115, p. 3, ¶ 7]. Officer Laramie encountered Mr. Dominguez either in the doorway or just inside the Eagan residence.[2] Officer Laramie identified himself as a police officer and directed the person inside the home to identify himself, which Mr. Dominguez did. [Doc. 97, UMF 10-11; Doc 115, p. 3, ¶¶ 10-11].

Mr. Dominguez and Officer Laramie gave different accounts regarding the events leading up to the shooting. According to Mr. Dominguez, he set his firearm down after entering the Eagan residence, and before Officer Laramie arrived at the scene. [Doc. 115, p. 9, ¶ 19]. However, according to Officer Laramie, after he identified himself the first time, Mr. Dominguez reached for his holster, which prompted Officer Laramie to identify himself a second time and order Mr. Dominguez to keep his hands down. [Doc. 97, UMF 12-13]. According to Officer Laramie, Mr. Dominguez disregarded the instruction, drew a firearm, and pointed it directly at Officer Laramie's face. [Doc. 97, UMF 14-15]. Officer Laramie discharged his firearm multiple times, hitting Mr. Dominguez. [Doc. 97, UMF 17, UMF 18; Doc. 115, p. 4, ¶¶ 17-18; Doc. 219, UMF 16; Doc 229, p. 2]. Officer Laramie immediately radioed for an ambulance. [Doc. 97, UMF 19; Doc. 115, p. 4, ¶ 19].

After the shooting, Officer Laramie observed a firearm on a chair inside the front door of the home. [Doc. 115, p. 11, ¶ 32]. He did not observe one near Mr. Dominguez. [*Id.*] During his deposition, Officer Laramie stated that, if he had known that someone was contacted in connection

---

[2] The parties dispute the precise location of this encounter. [Doc. 97, ¶ 9 (incorporated by reference into the instant Motion [Doc. 110. ¶ 2]); Doc. 115, p. 3, ¶ 9 (incorporated by reference into Plaintiffs' Response to the instant Motion [Doc. 219, p. 2, ¶ 2])].

4

with the security system activation at the Eagan residence and would be responding to the home, he would have believed that the person in the home was authorized to be there, and he would have handled the encounter with Mr. Dominguez differently. [Doc. 219, UMF 17-18; Doc 229, p. 2].

LiveWatch, the company with whom the Eagans contracted for security system monitoring services, provided those services through its contract with third-party CMS. [Doc. 110, UMF 9; Doc 219, p. 3, ¶ 9]. LiveWatch's provision of monitoring services through third-parties such as CMS was disclosed in the agreement between LiveWatch and the Eagans. [Doc. 219, UMF 27, 29; Doc 229, p. 2]. The agreement provides that through third-party monitoring agreements, LiveWatch is "able to obtain [monitoring] service[s] for the customer at attractive rates." [Doc. 110, UMF 8; Doc 219, p. 3, ¶ 8].

On March 4, 2013, LiveWatch was under contract with CMS through a "Master Alarm Monitoring Agreement" which had taken effect January 1, 2011 ("CMS Agreement"). [Doc. 110, UMF 9; Doc 219, p. 3, ¶ 9]. Prior to 2011, the agreements between LiveWatch and CMS included language identifying CMS as LiveWatch's agent for purposes of performing its contractual obligations. [Doc. 219, UMF 33; Doc 229, p. 2]. That language was excluded from the January 1, 2011 CMS Agreement. [Doc. 219, UMF 34; Doc 229, p. 2]. Under that Agreement, the parties agreed that CMS would perform security system monitoring at the instruction of LiveWatch and its subscribers to the extent that such instructions comported with CMS' policies and procedures and the applicable law. [Doc. 110, UMF 10; Doc 219, p. 3, ¶ 10]. LiveWatch also agreed to insure and indemnify CMS with respect to claims arising from or related to the CMS Agreement or performance of the obligations thereunder. [Doc. 219, UMF 36-38; Doc 229, p. 2].

In the course of its business with LiveWatch, CMS fields some of LiveWatch's customer service calls. [Doc. 219-4, pp. 13, 15; Doc. 219-5, p. 24]. When CMS operators answer these calls,

they identify themselves as being with LiveWatch. [Doc. 219-4, pp. 13, 15; Doc. 219-5, p. 24]. Additionally, CMS operators monitoring on behalf of "dealers" such as LiveWatch, are instructed to use the dealer's name when interacting with the subscriber so that the subscriber will recognize the company name. [Doc. 219, UMF 40-42; Doc 229, p. 2].

Plaintiffs' initial claims were brought on March 3, 2015, when Plaintiffs filed their *Complaint for Wrongful Death Under the New Mexico Tort Claims Act and New Mexico Common Law* [Doc. 1-1] in New Mexico's First Judicial District Court. Plaintiffs filed a *First Amended Complaint for Wrongful Death Under the New Mexico Tort Claims Act and New Mexico Common Law* [Doc. 1-2] on August 11, 2015 and a *Second Amended Complaint for Wrongful Death Under the New Mexico Tort Claims Act and New Mexico Common Law* [Doc. 1-3] on March 3, 2016. The case was removed to federal court on March 14, 2016. [Doc. 1].

Plaintiffs allege that LiveWatch negligently failed to advise Mr. Dominguez that SFPD was called to respond to the Eagans' security system activation and negligently failed to advise SFPD that Mr. Dominguez was also notified of the security system activation and would be responding to the Eagan residence. [Doc. 1-3, p. 22]. In the Motion now before the Court [Doc. 110], LiveWatch seeks summary judgment as to all of Plaintiffs' claims against it. For the reasons discussed below, the Court grants the Motion in part and denies the Motion in part.

## II. ANALYSIS

LiveWatch argues that it is entitled to summary judgment because (1) it did not owe Mr. Dominguez a duty of care; (2) it cannot be held liable for the alleged negligence of CMS or its operators; (3) Mr. Dominguez' conduct was an independent intervening cause which severed the causal connection between any alleged negligence by LiveWatch and Mr. Dominguez' death; and

6

(4) there is no evidence to support a punitive damages award against LiveWatch. [Doc. 110, pp. 5-16].

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998). If the movant carries this initial burden, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671. If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to him. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**A. LiveWatch has Failed to Demonstrate That It is Entitled to Summary Judgment on Plaintiffs' Common Law Negligence Claims Against It**

**1. The Duty Owed by LiveWatch**

LiveWatch argues that it owed no duty of care to Mr. Dominguez and therefore, Plaintiffs' negligence claims against it fail as a matter of law. [Doc. 110 pp. 5-8]. LiveWatch asserts that it did not have a special relationship with Mr. Dominguez such that it owed him an affirmative duty. [Doc. 110, pp. 5-8]. Implicit in this argument is the assumption that an affirmative duty is the only duty upon which Plaintiffs' negligence claims against LiveWatch could be based. Plaintiffs contend that LiveWatch did have a special relationship with Mr. Dominguez by virtue of his role as a named contact person, required by the Eagans' contract with LiveWatch. [Doc. 219, pp. 12-13]. Plaintiffs add that LiveWatch owed Mr. Dominguez a duty of reasonable care irrespective of whether or not any special relationship existed between him and LiveWatch. [Doc. 219, pp. 10-11].

It is well established under New Mexico law, that "[e]very person has a duty to exercise ordinary care for the safety of the person and the property of others." UJI 13-1604 NMRA. "'Ordinary care' is that care which a reasonably prudent person would use in the conduct of the person's own affairs. What constitutes 'ordinary care' varies with the nature of what is being done." UJI 13-1603 NMRA; *see Oakey, Estate of Lucero v. May Maple Pharmacy, Inc.*, 2017-NMCA-054, ¶ 23, 399 P.3d 939 ("Where a duty exists, it generally requires that the defendant's conduct conform to the same standard of care—that of a reasonable person under the same or similar circumstances, usually referred to as the ordinary care standard." (internal quotation marks and citation omitted)).

As a general rule, and absent a special relationship, New Mexico law does not impose a duty on a person to protect others from acts of third persons. *Monasterio v. Greyhound Lines, Inc.*,

No. 2:15-CV-00683-PJK-SMV, U.S. Dist. 2019 WL 318389, at *3 (D.N.M. Jan. 24, 2019) (citing *Ciup v. Chevron U.S.A., Inc.,* 1996-NMSC-062 ¶ 5, 122 NM 537, 928, P.2d 263). However, the New Mexico Supreme Court has held that the duty to exercise ordinary care, "may include the prevention of harmful conduct from a third person." *Id.* (citing *Rodriguez v. Del Sol Shopping Ctr. Assoc.*, 2014-NMSC-014, ¶ 5, 326 P.3d 465; *compare Grover v. Stechel*, 2002-NMCA-049, ¶ 11, 132 N.M. 140, 45 P.3d 80 (recognizing possessors of land as having a special relationship such that they may be required to protect another from harm).

In the present case, LiveWatch disputes whether it owed specific duty to warn or protect Mr. Dominguez against the alleged negligence of third-parties arising from a special relationship with CMS or Mr. Dominguez. [Doc. 110, pp. 5-8; Doc. 219, pp.11-13]. Discerning such a duty requires fact-based inquiries which the New Mexico Supreme Court rejected when it adopted the Restatement (Third) of Torts to analyze duty and breach. *See Rodriguez*, 2014-NMSC-014, ¶¶ 1, 5. The Restatement discourages courts from characterizing a duty in tort as a "fact-specific formulation." Restatement (Third) of Torts § 7 cmt. i (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1061 (Ill. 2006) ); *see also Rodriguez*, 2014-NMSC-014, ¶ 1. Under New Mexico law, the relevant duty analysis is not whether LiveWatch had a duty to undertake specific actions or to protect Mr. Dominguez from specific conduct, but whether it owed Mr. Dominguez a duty to exercise ordinary care. UJI 13-1604; *Rodriguez*, 2014-NMSC-014, ¶ 13; *see Monasterio*, No. 2-15-CV-00683-PJK-SMV, U.S. Dist. 2019 WL 318389, at *3–4 (D.N.M. Jan. 24, 2019).

New Mexico's approach requires that the Court first identify an existing duty, then "articulate specific policy reasons ... in deciding that a defendant does not have a duty or that an existing duty should be limited." *Rodriguez*, 2014-NMSC-014, ¶ 16. Here, LiveWatch had a duty to exercise ordinary care with respect to its dealings with CMS, the Eagans, and Mr. Dominguez.

*See* UJI 13-1604; *Rodriguez*, 2014-NMSC-014, ¶ 13. This duty existed irrespective of any special relationship between LiveWatch and Mr. Dominguez. *See Monasterio*, No. 2-15-CV-00683-PJK-SMV, U.S. Dist. 2019 WL 318389, at *3–4 (D.N.M. Jan. 24, 2019). LiveWatch has not pointed to any compelling policy reason to obviate or limit the duty of ordinary care it owed to Mr. Dominguez. [Doc 110, pp. 5-8]. Thus, LiveWatch has not demonstrated that it did not owe Mr. Dominguez a duty of ordinary care and that it is entitled to summary judgment on the question of duty as a matter of law.

### 2. LiveWatch's Liability for the Alleged Negligence of CMS and its Employees

In their Complaint, Plaintiffs state their allegations against LiveWatch as though LiveWatch, itself, interacted with Mr. Dominguez and the SFPD regarding the activation of the security system at the Eagan residence on March 4, 2013. [Doc. 1-3, ¶¶ 127 – 135]. However, it is undisputed that interactions with Mr. Dominguez and SFPD with respect to the Eagans' security system activation on March 4, 2013 involved CMS operators, not LiveWatch or its employees. [Doc. 97, UMF 2, 13; Doc. 115, p. 2 ¶ 2, p. 3 ¶ 13; Doc. 219, UMF 1, 2, 6, 9, 11, 14; Doc 229, p. 2].

LiveWatch argues that it is entitled to summary judgment on Plaintiffs' claims because those claims are based on the actions of CMS operators and at the relevant time CMS was acting as an independent contractor for whose conduct LiveWatch cannot be held liable. [Doc. 110, pp. 8-9]. Plaintiffs argue that genuine issues of material fact exist as to whether CMS was an independent contractor or an agent of LiveWatch. [Doc. 219, pp. 13-22]. Plaintiffs further contend that even if CMS was an independent contractor, a genuine factual dispute exists as to whether exceptions apply that permit the imposition of liability upon LiveWatch. [Doc. 219, pp. 22-23].

The Court must first consider whether factual issues exist with respect to CMS' status as an independent contractor or agent of LiveWatch. "An agent is one authorized by another to act on his behalf and under his control." *Hansler v. Bass*, 1987-NMCA-106, ¶ 28, 106 N.M. 382, 743 P.2d 1031. An agency relationship may be created by an oral or written agreement and "may be either expressed or implied by a course of conduct showing an intention that the relationship exists." UJI 13-401 NMRA. An agency relationship does not arise until "the principal has in some manner indicated that the agent is to act for him, and that the agent so acts or agrees to act on his behalf and subject to his control." *San Juan Agr. Water Users Ass'n v. KNME-TV*, 2011-NMSC-011, ¶ 16, 150 N.M. 64, 257 P.3d 884, 889. Once an agency relationship is created, a principal is generally liable for the actions of the agent when the agent acts within the scope of the agent's employment and the principal has the right to control the manner in which the agent performs the action. UJI 13-402 NMRA 2017. "[A] principal's control over the agent is the key characteristic of an agency relationship." *Carlsberg Mgmt. Co. v. State Taxation & Revenue Dep't*, 1993-NMCA-121, ¶ 12, 116 N.M. 247, 250, 861 P.2d 288, 291. Even where there is no actual agency with the right to control, a principal may still be held liable if it has clothed the agent with apparent authority, that is, if the principal has by its statements, acts or conduct led the plaintiff to reasonably believe the agent was acting as such and if the plaintiff dealt with the agent in justifiable reliance upon the principal's representations. UJI 13-408 NMRA; Restatement (Second) of Agency § 140(b).

By contrast, "[a]n independent contractor is one who agrees to do certain work where the person who engages the contractor may direct the result to be accomplished but does not have the right to control the manner in which the details of the work are to be performed." UJI 13-404 NMRA. The person or entity who hires an independent contractor is generally not liable for the

11

conduct of the contractor. *Id.* "Under an agency analysis, the principal's right to control the individual performing the work often distinguishes an employee [or agent] from an independent contractor," *Celaya v. Hall*, 2004-NMSC-005, ¶ 11, 135 N.M. 115, 118, 85 P.3d 239, 242.

However, the right to control is only one among many factors to consider, including: whether the hired party is engaged in a distinct business or occupation, whether the type of work is customarily done under the direction of the employer or without supervision, the skill level required by the type of work in question, which party provides the supplies and workplace used by the hired party to complete the work, the length of time of the employment, the manner of calculating payment, whether the work is part of the employer's regular business, the parties' belief that there is an agency relationship, and whether the principal is in business. *See* Restatement (Second) of Agency § 220 (1958); *see also Celaya*, 2004-NMSC-005, ¶ 14 (recognizing the New Mexico Supreme Court's adopting of the Restatement (Second) of Agency approach).

In its Motion, LiveWatch argues that no material factual dispute exists regarding CMS' status as an independent contractor. [Doc. 110, pp. 5-9]. LiveWatch points to a provision in its Monitoring Agreement with the Eagans under which the parties expressly acknowledge that LiveWatch does not provide monitoring services directly, but rather obtains such services "at attractive rates" through "contractual arrangements and its purchasing power." [Doc. 110, UMF 8; Doc 219, p. 3, ¶ 8]. LiveWatch also points to the language of the CMS Agreement, which was modified from prior versions of the contract to exclude express references to CMS as an agent of LiveWatch. [Doc. 219, UMF 10, 34; Doc 229, pp. 2-3]. LiveWatch further points out that CMS' maintains autonomy under the CMS Agreement, agreeing to implement the suggestions of LiveWatch and its subscribers to the extent they are not in conflict with CMS' policies and procedures. [Doc. 219, UMF 10, 34; Doc 229, pp. 2-3].

Plaintiffs maintain that questions of fact exist as to whether CMS is an independent contractor or whether LiveWatch and CMS have an agency relationship. [Doc. 219, pp. 13-19]. Plaintiffs point to a number of undisputed facts as supporting the existence of an agency or apparent agency relationship between LiveWatch and CMS which could give rise to LiveWatch's liability. [Doc. 219, pp. 13-19]. In support of a direct agency relationship, Plaintiffs point out that LiveWatch markets itself as a provider of security system monitoring services but provided such services through CMS for the security system at the Eagan residence. [Doc. 219, UMF 8, 27, 29; Doc 229, pp. 2-3]. Plaintiffs also note that CMS gives LiveWatch and its subscribers some control over its operations by agreeing to provide monitoring services as instructed by LiveWatch and the subscriber to the extent that such instructions comport with CMS' policies and procedures and the applicable law. [Doc 219 UMF 10, 34, p. 15; Doc. 229, pp. 2-3]. In support of an apparent agency relationship, Plaintiffs point out that CMS operators field customer service calls on behalf of LiveWatch, identifying themselves as being with LiveWatch. [Doc. 219, pp. 13, 15; Doc. 219-5, p. 24]. CMS operators are also instructed to identify themselves as being with the LiveWatch monitoring Center when they make or receive calls related to security system monitoring for LiveWatch subscribers.[3] [Doc. 219, UMF 40-42; Doc 229, p. 2].

"Whether an agency relationship exists is a question of fact to be determined from all of the facts and circumstances of the case, together with the conduct and communications between the parties." *New Mexico Military Inst. v. NMMI Alumni Ass'n, Inc.*, 2018-NMCA-___, ¶ 20, (No. 35,621, October 22, 2018) (internal quotation marks and citation omitted). Here, the evidence upon

---

[3] While deposition testimony establishes that CMS operators are instructed to identify themselves as being with the alarm company, in this case LiveWatch, [Doc. 219-4, pp. 13, 15; Doc. 219-5, p. 24], only one of the three CMS operators here identified himself as being with LiveWatch when he spoke with SFPD dispatch on March 4, 2013. [Doc. 219, p.4, ¶ 12; Doc. 229, p. 2]. No such representation was made by the operator who spoke with Mr. Dominguez. [*Id.*].

which the parties rely leaves questions of material fact as to the nature of the relationship between LiveWatch and CMS. These factual questions go to several of the factors adopted by New Mexico for determining whether an agency relationship exists including: the level of control LiveWatch has over CMS' monitoring operations; whether the services provided by CMS are an integral part of LiveWatch's business; and whether Mr. Dominguez relied upon any apparent authority with which CMS acted in its interactions with him. *Celaya*, 2004-NMSC-005, ¶ 14.

LiveWatch has not demonstrated the absence of material facts as to CMS' status as an independent contractor or agent, and the Court finds that on the record evidence in this case a reasonable jury could find that an agency relationship existed between LiveWatch and CMS. *See Bird*, 832 F.3d at 1199 ("A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law."). Accordingly, LiveWatch has failed to demonstrate that it is entitled to summary judgment on this point.[4] *See* UJI 13-401 NMRA; UJI 13-404; UJI 13-408; *Celaya*, 2004-NMSC-005, ¶ 14. [5]

---

[4] Because there are questions of material fact as to whether CMS is an agent or independent contractor of LiveWatch, any analysis of whether security system monitoring is inherently dangerous is premature as this is an exception to the general rule precluding vicarious liability for the negligence of independent contractors after independent contractor status has been established. *See* UJI 13-404.]

[5] As the propriety of summary judgment on the question of vicarious liability was resolved by the Court without reliance on any new arguments or evidence presented for the first time in LiveWatch's Summary Judgment Reply [Doc. 229], Plaintiffs' Motion for Leave to File a Surreply is denied. *See Conroy v. Vilsack*, 707 F.3d 1163, 1180 (10th Cir. 2013) ("[Tenth Circuit] case law makes clear that a district court abuses its discretion only when it both denies a party leave to file a surreply *and* relies on new materials or new arguments in the opposing party's reply brief."); *see also Pippin v. Burlington Res. Oil & Gas Co.,* 440 F.3d 1186, 1191-92 (10th Cir.2006); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d at 1139 n. 13; *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1164–65 (10th Cir.1998).

### 3. Mr. Dominguez' Conduct as an Independent Intervening Cause

In its Motion, LiveWatch argues that Mr. Dominguez assaulted Officer Laramie by pointing a firearm at him and that this conduct constituted an assault on Officer Laramie which severed the causal connection between any alleged negligence by LiveWatch and Mr. Dominguez' death. [Doc. 110, pp. 13-14]. Plaintiffs contend that factual issues exist as to whether Mr. Dominguez pointed a weapon at Officer Laramie and, thus, factual questions exist as to whether Mr. Dominguez' conduct constituted an independent intervening cause. [Doc. 219, p. 24].

New Mexico appellate courts have "virtually eliminated the use of the doctrine of independent intervening cause as a defense in cases involving only allegedly negligent (as opposed to intentional) conduct by the parties because the doctrine is incompatible with New Mexico's system of comparative negligence." *Silva v. Lovelace Health Sys., Inc.*, 2014-NMCA-086, ¶ 14, 331 P.3d 958; *see Torres v. El Paso Elec. Co.,* 1999-NMSC-029, ¶ 18, 127 N.M. 729, 987 P.2d 386 (holding that "the jury shall not be instructed on independent intervening cause for a plaintiff's alleged comparative negligence"); *Chamberland,* 2001-NMCA-045, ¶ 19, 130 N.M. 532, 27 P.3d 1019 (holding that a jury instruction on the doctrine is inappropriate where the issues involve "no more than a simple dispute over causation in fact (i.e., whether the defendant's negligence did or did not cause in fact the injuries suffered by the plaintiff)").

As explained in UJI 13-306 NMRA, "[a]n independent intervening cause interrupts and turns aside a course of events and produces that which was not foreseeable as a result of an earlier act or omission." Consequently, the New Mexico Court of Appeals has held that the application of the doctrine of independent intervening cause as a defense in cases involving only negligent conduct overemphasizes the negligence of parties other than the defendants. *See Torres,* 1999-NMSC-029, ¶ 18 (explaining that an instruction that a plaintiff's negligence could constitute an

independent intervening cause "unduly emphasize[s] a defendant's attempt to shift fault to a plaintiff"). Nonetheless, the doctrine of independent intervening cause may be a viable defense in cases involving a claim "that an intentional or criminal act or an act of nature that is unforeseeable intervenes and disrupts the chain of causation set in motion by a defendant's negligent conduct." *Silva*, 2014-NMCA-086, ¶ 18.

In this case, Mr. Dominguez and Officer Laramie gave different accounts regarding the events leading up to the shooting. In a statement made prior to his death, Mr. Dominguez stated that after entering the Eagan residence he set his firearm down. [Doc. 115, p. 9, ¶ 19]. According to Mr. Dominguez, this occurred before Officer Laramie arrived on the scene. [*Id.*]. Mr. Dominguez' account was corroborated by the fact that after the shooting, Officer Laramie saw a firearm on a chair inside the front door of the home, but he did not see a firearm near Mr. Dominguez. [Doc. 115, p. 11, ¶ 32]. However, in a deposition given in connection with this case, Officer Laramie testified that after he entered the Eagan residence and identified himself, he saw Mr. Dominguez reaching for his holster. [Doc. 97, UMF 12-13]. According to Officer Laramie, he identified himself a second time and ordered Mr. Dominguez to keep his hands down, but Mr. Dominguez drew a firearm and pointed it directly at him. [Doc. 97, UMF 14-15]. Officer Laramie then discharged his firearm multiple times, hitting Mr. Dominguez. [Doc. 97, UMF 17, UMF 18; Doc. 115, p. 4, ¶¶ 17-18; Doc. 219, UMF 16; Doc 229, p. 2].

Based on these accounts and the location of the firearm on the chair, factual questions exist regarding the location of Mr. Dominguez' firearm immediately preceding the shooting and whether he pointed a firearm at Officer Laramie as well as whether he perceived Officer Laramie as a police officer or intruder. Thus, there is a material factual dispute as to whether an intentional or criminal act occurred that would interrupt the causal connection between any alleged negligent

conduct by LiveWatch and Mr. Dominguez' death. As a result, LiveWatch has not demonstrated that summary judgment is appropriate for lack of causation due to an independent intervening cause.

**B. Punitive Damages**

In its motion, LiveWatch argues that summary judgment on Plaintiffs' claim for punitive damages is appropriate because there is no evidence that it acted with the culpable mental state required to justify a punitive damages award. [Doc. 110, p. 15].[6]

The purpose of punitive damages in a negligence claim is to punish defendants and to deter similar conduct in the future. Restatement (Second) of Torts, § 908(1) (1979). New Mexico recognizes that case law from the majority of other jurisdictions indicates that "mere negligence or inadvertence is not sufficient to support an award of punitive damages." *Gonzales v. Sansoy*, 1984-NMCA-133, ¶ 6, 103 N.M. 127, 703 P.2d 904. Punitive damages may only be awarded if defendant's conduct during the alleged incident was malicious, willful, reckless, wanton, fraudulent, or in bad faith. UJI 13-1827 NMRA. Because the purpose of punitive damages is to punish the defendant, it is a remedy that should be used when the conduct involves a culpable mental state. *See id.*; Restatement (Second) of Torts, § 908 cmt. (b).

New Mexico law permits the imposition of vicarious liability for punitive damages against an employer where (a) an employee acts with the requisite culpable mental state, in the course of employment, and the employee has "sufficient discretionary or policy-making authority to speak

---

[6] The Court notes that while Plaintiffs' Second Amended Complaint includes express claims for punitive damages as to the Eagans, Officer Laramie, and the Santa Fe Regional Communications Center operators, they do not advance such direct claims against LiveWatch. [Doc. 1-3, pp. 22, 24]. However, Plaintiffs do allege that "the conduct of LiveWatch involved recklessness, gross negligence, willfulness, and/or callous indifference to Mr. Dominguez' rights." In their Response to LiveWatch's Motion for Summary Judgment, Plaintiffs do not deny that they have advanced a punitive damages claim. [Doc. 219, pp. 24-25]. Accordingly, the Court will address the propriety of summary judgment on a claim of punitive damages to the extent it is asserted against LiveWatch and as addressed by the parties in the summary judgment briefing.

and act for [the employer] with regard to the conduct at issue, independently of higher authority…" or (b) that the employer somehow "authorized, participated in, or ratified the conduct of [the employee]." UJI 13-1827(2).

As previously discussed, there is a factual question as to whether the CMS operators at issue were agents of LiveWatch by virtue of the contractual relationship between LiveWatch and CMS. However, even if such an agency relationship existed, LiveWatch has identified no evidence that the operators had any discretionary or policy-making authority with respect to LiveWatch such that the operators could speak and act for LiveWatch with regard to the conduct at issue. *See* UJI 13-1827(2)(a). With respect to ratification of the CMS operators' conduct as a basis for punitive damages against LiveWatch, Plaintiffs must demonstrate that LiveWatch engaged in willful, reckless, or wanton conduct apart from the alleged conduct of the CMS operators. *See Gillingham v. Reliable Chevrolet*, 1998-NMCA-143, ¶ 20, 126 N.M. 30, 966 P.2d 197, *overruled on other grounds by Fernandez v. Espanola Pub. Sch. Dist.*, 2005-NMSC-026, ¶ 20, 138 N.M. 283, 119 P.3d 163 ("In order to impose punitive damages against an employer, its conduct must be found to be willful, reckless, or wanton, *apart from the conduct of its employee [or agent]*." (emphasis added)). However, no such independent conduct by LiveWatch is alleged or demonstrated by the evidence in this case. [Doc. 1-3, ¶¶ 127-136; Doc. 219, p. 24-25]. As such, summary judgment on any punitive damages claim advanced against LiveWatch is granted.

## CONCLUSION

IT IS ORDERED THAT *Defendant LiveWatch Security LLC's Motion for Summary Judgment* [Doc. 110] is GRANTED IN PART as to Plaintiffs' claims of punitive damages against LiveWatch and DENIED as to Plaintiffs' Eighth Cause of Action (claims under New Mexico common law against Defendant LiveWatch).

IT IS SO ORDERED.

_____
JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent